UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LLOYD'S SYNDICATE 1861 AND                    CIVIL ACTION
D&B BOAT RENTALS, INC.

VERSUS                                        NO: 13-5551

CROSBY TUGS, L.L.C.                           SECTION: R(2)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**I.    INTRODUCTION**

This dispute arises out of the May 30, 2013 sinking of the M/V
RICKY B, an offshore supply vessel owned by plaintiff D&B Boat
Rentals, Inc. ("D&B"). The vessel sank in the Gulf of Mexico while
being towed by the M/V DELTA FORCE, a tug operated by defendant
Crosby Tugs, L.L.C. ("Crosby"). D&B and its insurer, Lloyd's
Syndicate 1861 ("Lloyd's"), sued Crosby, alleging that the sinking
of the RICKY B was the result of negligent towing by Crosby.[1]
Plaintiffs seek reimbursement for the expenses they incurred in
removing the vessel from the Gulf. Crosby filed a counterclaim
alleging that it provided salvage towing services and seeking
compensation for its salvage efforts.[2]

On June 2-3, 2014, the Court held a bench trial on the
plaintiffs' claims. Although Crosby maintained as part of its

_____

[1]    R. Doc. 1.

[2]    R. Doc. 15 (Crosby's Amended Answer and Counterclaim).

defense that it provided salvage services, it did not pursue its counterclaim at trial. The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1333, as the claims arise from the towing and subsequent sinking of a vessel. *See* 28 U.S.C. § 1333 ("The district courts shall have original jurisdiction, exclusive of the courts of the States, of [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."); *Waterman S.S. Corp. v. Shipowners & Merchs. Towboat Co.*, 199 F.2d 600, 601 (9th Cir. 1952) (suit arising out of the towing of a vessel in distress falls within the federal courts' admiralty jurisdiction). After hearing live testimony and reviewing all the evidence, the Court rules as follows.


## II.  FINDINGS OF FACT

### A.  The RICKY B Springs a Leak.

At the time of the events giving rise to this litigation, plaintiff D&B owned the RICKY B, a "steel hulled Offshore Supply Vessel" built in 1981.[3] The vessel weighed 89 gross tons, measured 83.5' x 24' x 7',[4] and, according to its Certificate of Inspection

---

[3]      Uncontested Material Facts g, h.

[4]      Uncontested Material Fact i.

2

from the United States Coast Guard, was required to operate with a four-person crew.[5]

On May 28, 2013, at approximately 8:00 P.M., while working in the Gulf of Mexico servicing drilling platforms, the vessel began to take water into the engine room as a result of a leak in the starboard stuffing box.[6] The bilge alarm sounded, alerting the crew to the accident.[7] At the time of the leak, the vessel was being operated by a crew of three, in violation of its Certificate of Inspection.[8] Joshua Smith, the captain of the RICKY B, testified that when he discovered the leak, he tightened the nuts around the stuffing box, which appeared to resolve the problem.[9]

The next morning, May 29, the problem worsened.[10] At 6:41, the

---

[5]     Joint Ex. 4.

[6]     Uncontested Material Fact e; Testimony of Joshua Smith; Testimony of Michael Donner; Joint Ex. 7.

[7]     Uncontested Material Fact e.

[8]     Testimony of Michael Donner; Joshua Smith; Thompson Dep. 7:9-7:12, Apr. 15, 2014; Joint Ex. 7.

[9]     Jules Knoulton, an employee of the company that conducted the wreck removal of the RICKY B, testified that when he inspected the stuffing box, the nuts on the stuffing box were "backed out 3 to 4 inches, and there might have been a couple that were completely off." Knoulton Dep. 10:21-10:23, May 15, 2014. This casts doubt on Captain Smith's assertion that he attempted to seal the stuffing box after the leak began.

[10]     Testimony of Joshua Smith.

RICKY B sent an e-mail to Louisiana Marine Operators, the operator of the RICKY B, that reads, "ngine [*sic*] room is flooded, vr 171 [Vermillion Block 171] area. We are sinking."[11] Captain Smith testified that he took steps to prevent the RICKY B from sinking, including pumping the ballast and water tanks around the engine room. The RICKY B continued to work in the field until the end of Captain Smith's shift at approximately 10:30 A.M.,[12] at which time he ordered the vessel to proceed Dulac, Louisiana.[13]

When Captain Smith went off duty, he was relieved by the Second Captain, Joseph Frank.[14] After assuming control of the vessel, Captain Frank engaged the starboard engine,[15] which apparently caused water to begin rushing into the engine room.[16] Captain Smith testified that at this time the water in the engine room rose above the stuffing boxes. He made a distress call to the Coast Guard and directed Captain Frank to look for a location to

---

[11]   Def.'s Ex. 11.006; Testimony of Joshua Smith.

[12]   Uncontested Material Fact f.

[13]   Joint Ex. 1; Def.'s Obj. Ex. 1.001.

[14]   Testimony of Joshua Smith.

[15]   Def.'s Obj. Ex. 1.001.

[16]   Testimony of Joshua Smith; Thompson Dep. 20:11-20:14, 20:20-20:22.

tie up.[17] A mandatory post-casualty drug test of the RICKY B's crew revealed that Captain Frank was under the influence of cocaine at the time he was operating the vessel.[18] This qualifies as a violation of both Louisiana Marine Operators company regulations and Coast Guard regulations.[19]

**B.    The Crew Abandons Ship and Requests Crosby's Assistance.**

By the early afternoon, the RICKY B had lost power.[20] Another vessel, the M/S MONICA, attempted to help the crew pump water off the RICKY B, but the efforts were unsuccessful.[21] Once the water in the engine room reached a certain height, Michael Donner of Louisiana Marine Operators ordered the crew to abandon ship.[22] The crew abandoned ship around 2:00 or 3:00 P.M.[23] At the time of abandonment, the doors to the engine room were open and the cargo on board the RICKY B was not secure.[24] The crew's failure to secure

---

[17]    *Id.*

[18]    Testimony of Michael Donner; Def.'s Ex. 11.

[19]    Testimony of Michael Donner.

[20]    Thompson Dep. 20:24-21:2.

[21]    *Id.* 21:7-22:2.

[22]    Testimony of Michael Donner.

[23]    Testimony of Joshua Smith; Thompson Dep. 21:5-21:9.

[24]    Thompson Dep. 16:19-16:21, 24:6-25:2, 31:4-31:10.

the cargo violated a Stability Letter of the United States Coast Guard that required that cargo be secured at all times.[25]

Captain Smith testified that he sealed the engine room and both emergency hatches before leaving the RICKY B. The Court does not find this testimony credible, as it contradicts the testimony of multiple witnesses who indicated that the engine room either was not sealed or could not have been sealed, and that the emergency hatches were not secured.[26]

Captain Smith boarded a nearby platform to wait for assistance for the RICKY B.[27] At that point, Donner, of Louisiana Marine Operators, contacted Dale Martin, a marine broker, to find a tug that could tow the RICKY B to safety.[28] Donner told Martin that the tug should not attempt to pump water from the RICKY B or otherwise board the RICKY B, due to the vessel's perilous condition.[29] Martin called Crosby and explained that the RICKY B was in distress and in need of a tug.[30] Martin stated that D&B, the owner of the RICKY B,

---

[25]   Def.'s Ex. 12.001.

[26]   *See* Thompson Dep. 24:6-25:2; Testimony of Douglas Verdin; Timothy Anselmi; Arthur Sargent; Howard Held.

[27]   Testimony of Joshua Smith.

[28]   Testimony of Michael Donner; Dale Martin.

[29]   Testimony of Michael Donner.

[30]   Testimony of Dale Martin; Kurt Crosby.

6

wanted to get a line on the vessel and tow it to Morgan City, Louisiana, toward shallower waters.[31] At trial, David Barras, the owner of D&B, testified that he hired Crosby to tow the RICKY B and not to furnish pumps or board the vessel. D&B wanted to bring the RICKY B to shallower waters before it sank, to save time and expense in salvage operations.[32]

### C.    Towage or Salvage?

The parties dispute whether the service that Crosby agreed to render to the RICKY B was in the nature of towage or salvage. "Towing a vessel into a harbor may or may not be a salvage service," depending on the facts of the particular case. *The J.C. Pfluger*, 109 F. 93, 95 (N.D. Cal. 1901). Here, the Court finds that Crosby rendered salvage service to the RICKY B.[33]

"The character of the service rendered determines whether a contract is one for salvage." *Evanow v. M/V Neptune*, 163 F.3d 1108, 1114 (9th Cir. 1998) (citing *The Camanache*, 75 U.S. (8 Wall.) 448, 477 (1869)). "When a tug is called or taken by a sound vessel as a

---

[31]    Testimony of Kurt Crosby.

[32]    Testimony of David Barras; Dale Martin.

[33]    Whether a given service is for towage or salvage is a question of fact. *See Waterman S.S. Corp.*, 199 F.2d at 601; *The J.C. Pfluger*, 109 F. at 95; 1 Robert Force & Martin J. Norris, *The Law of Seamen* § 9:48 (5th ed. 2013).

mere means of saving time, or from considerations of convenience, the service is classified as towage; but if the vessel is disabled, and in need of assistance, it is a salvage service." *Id.* (quoting *The Flottbek*, 118 F. 954, 960 (9th Cir. 1902)); *accord* 3A-II *Benedict on Admiralty* § 16. "The major element distinguishing salvage [from towage] is an unanticipated marine peril that gives rise to or occurs during towage." 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 16-1 (5th ed. 2013) (collecting cases); *see also Basic Boats, Inc. v. United States*, 352 F. Supp. 44, 47 (E.D. Va. 1972) (distinction between towage and salvage is that the former "is undertaken for the sole purpose of expediting the voyage," while the latter "is a service rendered to a vessel which removes it from some distress"); 3A-XIV *Benedict on Admiralty* § 188 ("When a vessel in peril is towed, not with a view merely to expedite her passage from one place of safety to another, but with the obvious purpose of relief from some circumstances of danger . . . the service rendered is a salvage service."). A "marine peril" exists "when a vessel is exposed to any actual or apprehended danger which might result in her destruction." *Evanow*, 163 F.3d at 1114 (quoting *Faneuil Advisors, Inc. v. O/S Sea Hawk*, 50 F.3d 88, 92 (1st Cir. 1995)). "The peril . . . need not necessarily be one of imminent and absolute danger." 3A-XIV *Benedict on Admiralty* § 185.

The Court finds that the RICKY B was in peril at the time it

8

enlisted the help of Crosby's tug, the M/V DELTA FORCE. The crew of the RICKY B had sent a message to shore reading, "we are sinking," and had abandoned ship. These facts alone compel the conclusion that the ship was in a position of peril. *See* 3A-V *Benedict on Admiralty* § 64 ("Abandonment of a vessel after collision or other mishap, so that she is left to the mercy of wind and waves places the ship in a position of peril.") (collecting cases); *id.* § 194 (that a vessel sends out a distress signal strengthens the inference that it was in peril); *cf. The Fearless*, 76 F. Supp. 959, 960 (N.D. Cal. 1948) (vessel that sprung a leak and was in danger of sinking was in peril); *The Gerberville*, 34 F.2d 825, 826 (D. Mass. 1929) (boat that had lost its sails, was leaking, and had signaled for help was in peril). Further, Captain Smith testified that the circumstances qualified as an emergency situation.

There is some evidence suggesting that the RICKY B had stabilized by the time the DELTA FORCE began towing it. Donner testified that other boats in the area, as well as the Coast Guard, reported that the RICKY B was stable before the DELTA FORCE arrived. Captain Smith testified that the RICKY B was derelict at anchor, but not sinking, when he returned to the vessel onboard the DELTA FORCE. Nonetheless, to qualify as a salvage operation, the peril "need not necessarily be one of imminent and absolute danger." 3A-XIV *Benedict on Admiralty* § 185. The Court finds that, even if the RICKY B were stable at the time the DELTA FORCE

arrived, it nonetheless was in danger of eventual destruction if it remained on the water. Donner testified that he knew there was a risk that the RICKY B could sink to the bottom of the Gulf as a result of the leak. John Leary, plaintiffs' expert witness in the field of naval architecture, opined that, while he believed the RICKY B was stable when the DELTA FORCE arrived, it might have sunk if it remained on the water and was subject to adverse conditions such as larger waves. Finally, Arthur Sargent, Crosby's expert in the field of naval architecture, testified that the RICKY B was bound to sink eventually if left at sea, because waves would crash onto the deck and enter the vessel via various open portals. The Court credits the testimony of these witnesses. Accordingly, Crosby's service was in the nature of salvage.

Specifically, the Court finds that Crosby's service was "contract salvage," whereby a "salvor acts to save maritime property after entering into an agreement to use 'best endeavors' to do so." Schoenbaum, *supra* § 16-6. "A salvage contract when effective and binding will keep an admiralty court from a determination of the merits of the salvage service and preclude the court from fixing a salvage reward in its discretion." 3A-XII *Benedict on Admiralty* § 160. Here, Crosby charged $70,800 for use

of the DELTA FORCE, at a fixed rate of $1200 per hour.[34] D&B paid this sum in full.[35] Because the agreement between Crosby and D&B reflected "a definite and explicit bargain," *id.*, Crosby is not entitled to a further salvage award.

### D.   Crosby Responds to the Call.

After receiving its instructions from Martin (the broker who served as liaison between Crosby and D&B), Crosby enlisted the DELTA FORCE, an oceangoing tug owned and operated by Crosby, to retrieve the RICKY B.[36] The DELTA FORCE set off from Berwick, Louisiana, at 6:00 P.M. on May 29, 2013.[37] While the tug was in route, Captain Smith, who was still on the platform in the Gulf, spoke with Philip Trosclair, the captain of the DELTA FORCE, and asked whether the DELTA FORCE had a pump onboard.[38] Trosclair replied that it did not.[39] He then called the dispatcher at Crosby's office and asked whether he should obtain a pump.[40] Kurt Crosby,

---

[34]   Joint Ex. 11.

[35]   Testimony of David Barras.

[36]   Uncontested Material Facts b, c.

[37]   Joint Ex. 6.

[38]   Testimony of Joshua Smith; Philip Trosclair.

[39]   Testimony of Joshua Smith.

[40]   Testimony of Philip Trosclair.

Crosby's president, called Martin, who in turn called Donner for instructions.[41] Donner told Martin that the crew of the DELTA FORCE should "absolutely not" attempt to pump water from the RICKY B, because the vessel's condition was too dangerous.[42] Martin then called Crosby and instructed that the DELTA FORCE crew should tow the RICKY B to shallower waters and should not attempt to pump water from the vessel.[43] Kurt Crosby testified that his understanding was that D&B did not want Crosby's crew members to board the RICKY B with pumps, out of concern for their safety. The Crosby dispatcher called Captain Trosclair and told him not to worry about pumps.[44] The dispatcher instructed Trosclair to get a tow line onto the RICKY B as soon as possible and bring the vessel to shallower waters.[45]

At approximately 1:00 A.M. on May 30, the DELTA FORCE reached Captain Smith at the platform and, with Captain Smith onboard, continued to the RICKY B.[46] The DELTA FORCE found the RICKY B in

---

[41]    Testimony of Dale Martin; Kurt Crosby.

[42]    Testimony of Dale Martin.

[43]    Testimony of Kurt Crosby.

[44]    Testimony of Philip Trosclair.

[45]    *Id.*

[46]    Testimony of Joshua Smith; Maurice Solet.

South Marsh Island Block 27 shortly after 2:00 A.M.[47] At that time, the vessel had between three and four feet of freeboard and a slight list to port,[48] and there were waves washing onto the deck.[49] Captain Smith testified that the status of the vessel had not changed appreciably between the time the crew abandoned ship and the time the DELTA FORCE arrived at the RICKY B.

Captain Smith testified that, although he had been told that the DELTA FORCE did not have a pump, he saw one onboard and suggested that they try to pump water from the RICKY B. Maurice Solet, the mate of the DELTA FORCE, told Smith that he would have to check with his office before deciding how to proceed.[50] Initially Solet felt that it was not safe to tow the RICKY B.[51] His office, however, instructed him to start towing the RICKY B and not to board the vessel.[52]

Solet testified that, based on the condition of the vessel, it

---

[47]    Joint Ex. 6; Testimony of Maurice Solet.

[48]    Testimony of Joshua Smith; Maurice Solet; Joint Ex. 12.

[49]    Testimony of Maurice Solet.

[50]    Testimony of Joshua Smith. Solet testified that the pump onboard the DELTA FORCE was broken.

[51]    Testimony of Maurice Solet.

[52]    *Id.*; Joshua Smith.

would have been unsafe to place any crew members on the RICKY B.[53] Nonetheless, Captain Smith agreed to board the vessel to place a vinyl tow line on it.[54] At 3:45 A.M., with Solet at the helm, the DELTA FORCE began towing the RICKY B toward Morgan City, in the direction of shallower waters.[55]

Solet testified that he towed the RICKY B at a speed of three to four knots, or approximately three and a half to four and a half miles per hour.[56] Captain Smith testified that the DELTA FORCE towed the RICKY B at a high speed – as fast as six knots, or approximately seven miles per hour.[57] He testified that he commented on the speed while in the wheelhouse of the DELTA FORCE but was told not to make suggestions.[58] The Court does not credit Captain Smith's testimony on this issue, as it contradicts the credible testimony of Solet and Captain Trosclair, who testified that the speed of the DELTA FORCE did not exceed five knots and that Smith offered no criticism of the towing operation while it was

---

[53]   Testimony of Maurice Solet.

[54]   Testimony of Joshua Smith; Maurice Solet.

[55]   Testimony of Maurice Solet; Philip Trosclair; Dale Martin; Joint Ex. 6.

[56]   Testimony of Maurice Solet.

[57]   Testimony of Joshua Smith.

[58]   *Id.*

underway.[59] Further, the written statement Captain Smith recorded while on board the DELTA FORCE makes no mention of excessive speed.[60] Were Captain Smith concerned about the speed at which the vessel was being towed, he would likely have noted it in his contemporaneous statement.

At 6:00 A.M., Solet was relieved by Captain Trosclair.[61] Solet testified that, at the time he went off duty, the RICKY B had a greater list and was lower in the water than when he began towing it.[62] Around the same time, the soft tow line broke, and either Solet or Captain Trosclair decided to replace it with a steel tow line.[63] Douglas Verdin, a DELTA FORCE crew member who boarded the RICKY B to help change the line, testified that the RICKY B was listing to port more than ten degrees, that the bridge door and main deck door were latched open, and that there was water on the

---

[59]    Testimony of Maurice Solet; Philip Trosclair; *see also* Testimony of Dale Martin.

[60]    Joint Ex. 1.

[61]    Testimony of Philip Trosclair; Joshua Smith.

[62]    Testimony of Maurice Solet. Captain Smith testified that the RICKY B did not appear to be sinking while Solet was towing it. Because the Court does not find Captain Smith credible on several particulars, it credits Solet's testimony on this disputed point.

[63]    Testimony of Maurice Solet; Philip Trosclair; Joshua Smith.

15

deck.[64]

Captain Trosclair towed the vessel at a speed of no more than five knots, or six miles per hour.[65] Donner, of Louisiana Marine Operators, testified that he was told during this time that the DELTA FORCE was traveling at a fast speed and that the seas were rough, but that his instructions to Crosby remained the same: keep towing forward.[66] After 6:00 A.M., the cargo onboard the RICKY B began falling overboard.[67] Captain Smith testified that he made multiple calls to the Coast Guard to report the location of fallen cargo. By 7:30 A.M., the RICKY B had become fully submerged.[68] Although the RICKY B ultimately sank, the Court finds that Crosby's salvage efforts were successful, as, per instructions, it towed the RICKY B to shallower waters,[69] thereby saving D&B considerable time and expense in salvage operations.[70]

---

[64]     Testimony of Douglas Verdin; *see* Testimony of Howard Held.

[65]     Testimony of Philip Trosclair.

[66]     Testimony of Michael Donner; Dale Martin.

[67]     Testimony of Joshua Smith; Philip Trosclair.

[68]     Testimony of Joshua Smith; Joint Exhibit 6.

[69]     Testimony of Maurice Solet; Philip Trosclair; Kurt Crosby.

[70]     *See* Testimony of David Barras.

### E.   D&B's Incentive to Sue

The Court finds that D&B had an unusual financial incentive to bring suit against Crosby. According to testimony at trial, Lloyd's, D&B's insurer, took the position that the RICKY B was not seaworthy.[71] Although Lloyd's had insured the hull of the RICKY B for $600,000, it agreed to pay D&B only $450,000 under the policy.[72] It further agreed that if D&B cooperated in this lawsuit and the suit was successful, Lloyd's would pay D&B approximately $200,000 in additional reimbursement.[73] Thus, if D&B refused to participate in the suit against Crosby, it stood to recover only $450,000 on its $600,000 policy. On the other hand, if it assisted in the litigation, it might reap a profit of approximately $50,000 over its policy limit, and $200,000 over the amount that Lloyd's would otherwise pay on its claim. The Court finds that this arrangement gave D&B a strong financial motive to bring suit against Crosby, quite apart from whether it in fact believed Crosby to have been at fault.

## III. CONCLUSIONS OF LAW

---

[71]    Testimony of David Barras.

[72]    *Id.*

[73]    *Id.*

17

Plaintiffs argue that Crosby was negligent in two primary respects: (1) failing to pump the engine room before commencing the tow and (2) towing the RICKY B at an excessive rate of speed. Plaintiffs contend that those two instances of negligence caused the RICKY B to sink. Crosby responds that plaintiffs' claims are barred by the *Pennsylvania* Rule and that, in any event, plaintiffs cannot show that Crosby was negligent. According to Crosby, the RICKY B was in dire straits long before Crosby reached it, the vessel was doomed to sink notwithstanding Crosby's best efforts, and the DELTA FORCE's job was simply to ferry the RICKY B to shallow water as quickly as possible.

The Court will, first, address Crosby's argument concerning the *Pennsylvania* Rule and, second, evaluate whether Crosby violated the duty of care it owed to D&B as a contract salvor.


**A.    The *Pennsylvania* Rule**

In *The Pennsylvania*, 86 U.S. 125 (1873), the Supreme Court held that

> when . . . a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.

*Id.* at 136. "The rule allocates the burden of proof, transferring it to the party in violation of a statute or regulation." *Pennzoil Producing Co. v. Offshore Express*, 943 F.2d 1465, 1472 (5th Cir. 1991). The Fifth Circuit has extended the rule to apply not only to collisions but to "any 'statutory violator' who is a 'party to a maritime accident,'" *id.* (quoting *Sheridan Transp. Co. v. United States*, 834 F.2d 467, 476 (5th Cir. 1987)), so long as the statute was intended to prevent the accident that occurred, *see United States v. Nassau Mar. Corp.*, 778 F.2d 1111, 1116 (5th Cir. 1985). The rule has also been held applicable to salvage claims. *Mason v. Lynch Bros. Co.*, 228 F.2d 709, 712 n.3 (4th Cir. 1956) (citing *Waterman S.S. Corp.*, 199 F.2d 600).

Plaintiffs correctly note that the *Pennsylvania* Rule is not "a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable, or remote." *In re Mid-S. Towing Co.*, 418 F.3d 526, 534 (5th Cir. 2005) (quoting *Compania De Maderas De Caibarien v. The Queenston Heights*, 220 F.2d 120, 122-23 (5th Cir. 1955)). But the three statutory violations committed by the RICKY B – an inadequate number of crew members, a violation of the Stability Letter issued by the Coast Guard, and substance abuse by one of the crew members – have a potentially

direct relationship to the harm that befell the RICKY B. With regard to the first violation, Scott Thompson, the RICKY B's deckhand, testified that the vessel was not "ready to go offshore" because it was only manned by "three men with no engineer."[74] It is certainly possible that, had an engineer been aboard the vessel when the engine room began leaking, the engineer could have taken swifter and more effective corrective action than was actually employed, and possibly prevented the vessel from sinking. More generally, had the vessel had four rather than three crew members aboard, there would have been more manpower to deal with the leak.[75]

Turning to the second violation, the dictates of the Coast Guard's Stability Letter were clearly aimed at preventing boats from sinking due to instability caused by unsecured cargo.[76] Here, the evidence suggests that the unsecured cargo on the RICKY B contributed in some measure to the vessel's ultimate demise;[77] thus, the rule violated was "intended to prevent the injury that actually occurred." *Nassau Mar. Corp.*, 778 F.2d at 1116.

Finally, with respect to the third violation, the evidence

---

[74]   Thompson Dep. 25:11-25:17.

[75]   *See* Testimony of Michael Donner (three-man crew was insufficient to monitor accurately the condition of the engine room).

[76]   *See* Def.'s Ex. 12.

[77]   *See* Testimony of Arthur Sargent.

indicates that water began rushing into the engine room after Captain Frank engaged the starboard engine. Had Captain Frank not been impaired at the time he was operating the vessel, he might not have made that decision, and the vessel might have stayed afloat. Again, Coast Guard regulations prohibiting vessel operators from using intoxicants are clearly aimed at preventing accidents caused by impaired individuals.

Accordingly, the Court finds that the *Pennsylvania* Rule applies to these facts. *See Pennzoil*, 943 F.2d at 1472. And plaintiffs have failed to show that the statutory violations enumerated above *could not* have caused the sinking of the vessel. That is not the end of the case, however. "Although application of the rule imposes a heavy burden of proof, that is all it does. It does *not* determine a party's ultimate share of liability for a loss." *Id.* In other words, although the *Pennsylvania* Rule prohibits plaintiffs from totally disclaiming liability for the sinking of the RICKY B, they need not bear 100 percent of the responsibility. *See id.* Instead, "[l]iability . . . must be apportioned according to the comparative fault of the parties." *Id.* (citing *United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975)). Thus, the Court proceeds to consider whether Crosby is partially at fault for the accident and, if so, what portion of the responsibility Crosby should bear.

**B.   Crosby's Duty of Care as a Salvor**[78]

"[A] salvor must act in good faith and exercise reasonable skill and prudent seamanship." *Basic Boats, Inc. v. United States*, 352 F. Supp. 44, 48 (E.D. Va. 1972) (citing *The Laura*, 81 U.S. (14 Wall) 336 (1871)). A salvor will be held liable for affirmative damages in only two situations: (1) if the salvor is guilty of "gross negligence or willful misconduct," or (2) if the salvor's negligence causes a "distinguishable" or "independent" injury to the salved vessel, meaning an injury other than the one that salvage efforts were undertaken to prevent. Robert Force, *Admiralty and Maritime Law* 169-70 (2d ed. 2013); *see The Noah's Ark v. Bentley & Felton Corp.*, 292 F.2d 437, 440-41 (5th Cir. 1961); *Basic Boats*, 352 F. Supp. at 48. The Court holds that neither situation is present here, and accordingly that plaintiffs are not entitled to damages from Crosby.

In a post-trial memorandum of law filed with the Court,

---

[78]   In its submissions to the Court, plaintiffs have relied primarily on cases that concern the duty owed by a tug in a towage operation. *See, e.g.*, *Tidewater Mar. Activities, Inc. v. AM. Towing Co.*, 437 F.2d 124 (5th Cir. 1970). Because the Court finds that the service rendered by Crosby was salvage, not towage, these cases are inapposite. *See Basic Boats*, 352 F. Supp. at 47 (noting that the applicable standard of care in a given case depends on whether the contract in question is for towage or for salvage); Schoenbaum, *supra* § 16-1 ("The principles of towage law are distinct from salvage.").

plaintiffs argue for the first time that the standard of care for contract salvors such as Crosby is different from the standard of care for "pure," or voluntary, salvors.[79] They argue that while pure salvors are liable only for gross negligence or ordinary negligence resulting in a distinguishable injury, contract salvors are broadly liable for ordinary negligence. In support of this distinction, plaintiffs cite two cases.

First, they point to dicta in *United States v. Gavagan*, 280 F.2d 319 (5th Cir. 1960). *Gavagan* involved not private salvage but "the Government's liability under the Federal Tort Claims Act for death resulting from the manner in which the Government undertook [an] unsuccessful rescue . . . off the Florida Coast." *Id.* at 321. The Fifth Circuit found that the government's rescue operation "bore only limited resemblance to traditional salvage at sea. It was uniquely governmental, certainly in the sense of its size and organization." *Id.* at 322. Further, the culpable conduct causing harm was that of persons ashore, "and none of a kind requiring hard choices under the pressure of competing perils in extremis." *Id*. In determining the appropriate standard of care to apply to these unique circumstances, the court analogized, briefly, to "professional salvors operating under contract without regard to

---

[79] R. Doc. 67.

23

success or failure." *Id.* at 327. It stated that "[i]n that situation the salvor is to be held to the performance of his undertaking." *Id.* Plaintiffs rely on this language to assert that Crosby owed a higher standard of care as a contract salvor than it would have as a pure salvor.

Second, plaintiffs cite *Riverway Co. v. Trumbull River Services, Inc.*, 674 F.2d 1146 (7th Cir. 1982). In *Riverway*, the defendant bailee was safeguarding the plaintiff's barge. *Id.* at 1150. Under severe ice conditions, the defendant openly rejected its bailment obligations, forcing the plaintiff to hire a marine surveyor to "take charge of the situation" and attempt to keep the barge from sinking. *Id.* at 1148-49. The portion of *Riverway* that plaintiffs cite concerns only the duty owed by the bailee, and thus is inapplicable to this salvage action.[80] *See id.* at 1150. Elsewhere in its opinion, however, the Seventh Circuit addresses the duty owed by the marine surveyor, a third-party defendant in the case. *Id.* at 1152-53. The evidence showed that, when the surveyor was hired, the barge was moored to a sunken vessel that "appeared to be pulling or holding down [the barge's] port stern corner." *Id.* at 1148. The surveyor declined to cut the mooring cable between the two vessels, and the next morning the barge had

---

[80] *See* R. Doc. 67 at 2.

sunk irretrievably. *Id.* at 1149. The court found that the surveyor, having been hired to "do whatever needed to be done to keep [the barge] from sinking," had a "contractual duty to take reasonable and necessary remedial action to save the barge," and breached this duty when it "did absolutely nothing after being hired." *Id.* at 1152-53. As relevant here, the opinion likened the surveyor's duty to that of "a salvor hired to render assistance to a ship in distress, [who] must exercise reasonable care for the vessel to rescue it from a distressed condition." *Id.*

The Court acknowledges that *Gavagan* and *Riverway* suggest that contract salvors might be liable for ordinary negligence that results in a non-distinguishable injury. A year after *Gavagan*, however, the Fifth Circuit held that a salvor may be liable for ordinary negligence only if its conduct causes a distinguishable injury, with no distinction made between contract salvors and pure salvors. *The Noah's Ark*, 292 F.2d at 440-41. More recently, the Ninth Circuit observed, in a contract salvage case, that "[i]t is generally held . . . that a successful property salvor may be liable for ordinary negligence *that results in distinguishable injury.*" *Evanow v. M/V Neptune*, 163 F.3d 1108, 1116 (9th Cir. 1998) (emphasis added) (collecting cases). In that case, the court declined to decide the applicable standard of care, since it found that the plaintiffs were not liable under either the "strict Fifth

25

Circuit test" articulated in *The Noah's Ark* or under a more lenient standard that the Ninth Circuit had previously applied to life salvors. *Id.* Other courts have explicitly applied the *Noah's Ark* gross negligence standard to contract salvage. *See LaPlante v. Sun Coast Marine Servs., Inc.*, 279 F. Supp. 2d 678, 687 (D.S.C. 2003); *Continental Ins. Co. v. Garrison*, 54 F. Supp. 2d 874, 884 (E.D. Wis. 1999).

Further, the Court finds *Gavagan* not directly applicable to this case for two reasons. First, since *Gavagan* involved a "uniquely governmental" salvage operation, 280 F.2d at 322, the Fifth Circuit did not have occasion to decide the issue now before the Court – namely, the standard of care applicable to private contract salvors. While the *Gavagan* court analogized to "professional salvors operating under contract," it emphasized "the unique distinctions of this case" and warned that its holding should not "be thought to disturb the jurisprudence on the run-of-the-mill private salvage problems." *Id.* at 327-28. In view of this admonition, the Court accords *Gavagan* limited persuasive weight outside its particular factual circumstances. Second, the language plaintiffs cite from *Gavagan* specifically pertains to "professional salvors," 280 F.2d at 327, a category that overlaps, but is not co-extensive, with contract salvors. *See* 3A-XII *Benedict on Admiralty* § 176 ("professional salvor" does not include "the harbor or deep-

sea tug operator who is a part-time salvor under contract"). Here, Crosby is a contract salvor but not a professional salvor. *See id.* While courts reasonably may impose broad liability for ordinary negligence on professional salvors, who may be expected to secure insurance against the risk of negligent salvage efforts, the same rationale may not apply to tug operators who occasionally offer salvage services under contract. *See* Schoenbaum, *supra* § 16-4. Accordingly, the Court declines to apply the standard articulated in *Gavagan* in this case.

As to *Riverway*, the other case plaintiffs cite, the Court finds that the assertion in that case that contract salvors "must exercise reasonable care for the vessel to rescue it from a distressed condition" is ill-supported. *See* 674 F.2d at 1153. Neither of the cases *Riverway* cites supports a distinction between the standards of care owed by contract salvors and pure salvors. *See The Noah's Ark*, 292 F.2d at 440-41; *The Cape Race*, 18 F.2d 79, 81 (2d Cir. 1927). Rather, these cases stand for the rule that salvors generally are liable for ordinary negligence only when their conduct causes a distinguishable injury. *See The Noah's Ark*, 292 F.2d at 440; *The Cape Race*, 18 F.2d at 81. Accordingly, the Court declines to give significant weight to *Riverway*, a case that, in any event, is not binding on the Court.

The Court recognizes that there may be good reasons to apply

a higher standard of care to contract salvors than to pure salvors. Contract salvors can set the cost of their services in light of the risks involved. Thus, in theory, the risk of tort liability should not deter them from undertaking salvage efforts. Pure salvors, by contrast, might decline to offer their services if they could be held liable for ordinary negligence resulting in unsuccessful salvage. *See The Noah's Ark*, 292 F.2d at 441. As discussed *supra*, however, it may be unreasonable to expect the occasional, non-professional contract salvor to carry insurance against the risk of negligent salvage. *See* Schoenbaum, *supra* § 16-4. Without insurance coverage, non-professional contract salvors, like pure salvors, might be deterred from undertaking salvage efforts if they could be held liable for ordinary negligence resulting in unsuccessful salvage. Thus, "obvious policy considerations to encourage the human response of men of the sea to the saving of life and property," *The Noah's Ark*, 292 F.2d at 441, may militate against broad imposition of negligence liability on contract salvors. Further, an ordinary negligence standard of care for non-distinguishable injuries runs the risk of false positives in the imposition of liability, since it may be difficult, if not impossible, to distinguish between damage caused by a salvor's ordinary negligence and damage caused by the pre-existing peril to which a vessel was already exposed. *Cf. Kentwood Ltd. v. United*

28

*States*, 930 F. Supp. 227, 233 (E.D. Va. 1996) ("The distinguishable injury requirement serves to protect salvors from liability based on simple negligence for a mere failure to salvage a vessel.").

The Court concludes that *The Noah's Ark* remains the controlling precedent on this issue. There, the Fifth Circuit held that "for distinguishable independent damages . . . the maritime law holds the salvor to the usual standard of ordinary prudence," while "[t]he requirement for wilful or gross negligence as an element of salvor liability relates to injuries of a non-distinguishable, non-independent kind." *Id.* at 440, 441; *accord* Schoenbaum, *supra* § 16-4 ("Where salvage is attempted and the efforts are unsuccessful, the salvor is not liable for losses sustained either by the owners or third parties in the absence of causative gross negligence or wilful misconduct."); 3A-VIII *Benedict on Admiralty* § 120 ("When a distinguishable injury to the salved property has resulted from the negligence of persons undertaking a salvage service, it may result . . . in an affirmative award of damages against the salving vessel or the salvors."); *Kentwood*, 930 F. Supp. at 234 ("The Court makes explicit . . . that professional salvors are not liable in simple negligence merely for the failure of a salvage operation.") (citing *The Noah's Ark*, 292 F.2d at 441). Here, Crosby was not grossly negligent and did not cause any distinguishable, independent injury

29

to the RICKY B. Accordingly, plaintiffs are not entitled to damages.

### 1. Gross Negligence or Willful Misconduct

"Generally, a salvor is liable for an unsuccessful salvage only when there is a finding of gross negligence or willful misconduct." *Acadia Ins. Co. v. Allied Mar. Transp., LLC*, No. 00-19-P-C, 2000 WL 1183084, at *3 (D. Me. Aug. 16, 2000) (citing *Chesapeake Bay Bridge & Tunnel Dist. v. Oil Screw PRINCE*, 298 F. Supp. 881, 885 (E.D. Va. 1968)); *accord The S.C. Schenk*, 158 F. 54, 58-60 (6th Cir. 1907). Plaintiffs have offered no evidence that Crosby willfully damaged the RICKY B, so the Court will focus exclusively on gross negligence.

"Gross negligence" is defined as a "lack of slight diligence or care" or a "conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party." *Black's Law Dictionary* 1197 (10th ed. 2014); *see also Hendry Corp. v. Aircraft Rescue Vessels*, 113 F. Supp. 198, 201 (E.D. La. 1953) ("Gross negligence has been defined as the entire absence of care . . . . It consists of utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others."). "In applying this standard the Court should not second-guess difficult decisions made by rescue personnel in the

middle of an emergency . . . ." *DFDS Seacruises (Bahamas) Ltd. v. United States*, 676 F. Supp. 1193, 1201 (S.D. Fla. 1987).

Crosby's actions in this case do not even approach this high standard. True, Timothy Anselmi, one of plaintiffs' experts, opined that Crosby should have pumped the engine room before towing the RICKY B, in order to increase the vessel's buoyancy. Anselmi further testified that Crosby's failure to do so contributed to the sinking of the RICKY B. The Court finds, however, that Crosby had no duty to pump the RICKY B before towing it. Crosby's instructions were to put a tow line on the vessel as quickly as possible and to start towing it. D&B and Louisiana Marine Operators, via Dale Martin, explicitly instructed Crosby *not* to attempt to board or pump the vessel. In these circumstances, Crosby's failure to pump the engine room before towing the RICKY B does not amount to gross negligence.

Further, Solet stated that he did not consider pumping the RICKY B's engine room in part because it would have been too dangerous to attempt to board the vessel. The Court finds that Solet's determination in this regard was likely prudent, given the condition of the RICKY B. The crew had abandoned ship twelve hours earlier, and the vessel was sitting low in the water; it was reasonable for Solet to deduce from these facts that it was unsafe to go aboard. Certainly, his decision was not made in "utter

disregard of the dictates of prudence." *Cf. Algeria Enters. v. Immel's Mar.*, at *11-12 (salvor who arguably was guilty of negligence by towing a stranded vessel off a reef before pumping it free of water was "clearly" not guilty of "willful or gross negligence or wanton or reckless conduct"); *The Minnie E. Kelton*, 181 F. 237, 244-45 (D. Or. 1910) (schooner that towed stranded vessel to shore and beached her in a particular place was not guilty of gross negligence, even though there was "strong evidence that it was not the most appropriate place under all the circumstances to beach her").

Plaintiffs also contend that the DELTA FORCE negligently towed the RICKY B at an excessive rate of speed. The only direct evidence of that is the testimony of Captain Smith, and, as noted *supra* at Part II.D., the Court does not find his testimony credible on this point. The Court finds credible Captain Trosclair's testimony that he towed the vessel at a maximum speed of five knots, or six miles per hour. Even assuming *arguendo* that this speed were mildly excessive, the Court finds that it is not so fast as to constitute gross negligence.[81]

### 2. Distinguishable or Independent Injury

---

[81]   *See* Testimony of Timothy Anselmi (acknowledging that four knots was a safe speed at which to tow the RICKY B).

"[F]or distinguishable independent injuries done by the salvor, . . . maritime law holds the salvor to the usual standard of ordinary prudence." *The Noah's Ark*, 292 F.2d at 440. "A distinguishable injury . . . is some type of damage sustained by the salved vessel other than that which she would have suffered had not salvage efforts been undertaken to extricate her from the perils to which she was exposed." *Id.* at 441.

The Court finds that the damage complained of here – the sinking of the RICKY B – was not a "distinguishable injury." The parties dispute just how dire the condition of the vessel was when the DELTA FORCE began to tow it, but the evidence shows unequivocally that, in light of the leak in the engine room, the RICKY B was doomed to sink eventually (whether in hours, days or weeks). "Thus, the injury suffered by the vessel is not other than one she would have suffered without salvage efforts." *Sands v. One Unnamed 23' Seacraft Pleasure Vessel*, 959 F. Supp. 1488, 1494 (M.D. Fla. 1997); *see also LaPlante*, 279 F. Supp. 2d at 687-88 (holding that salvor called to tow a sinking vessel was not liable for the eventual sinking of the vessel because there was no "distinguishable injury" and the salvor was not grossly negligent). It follows that Crosby cannot be held liable, because its actions in towing the RICKY B were not grossly negligent. *See supra* at Part III.B.1.

33

3.   *Ordinary Negligence*

The Court finds that, even if it were to apply the standard of care urged by plaintiffs, it would nonetheless conclude that Crosby is not liable, as there is insufficient evidence to establish even ordinary negligence. "Negligence" is defined as the "failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation." *Black's Law Dictionary* 1196 (10th ed. 2014); *United States v. Pruett*, 681 F.3d 232, 242 (5th Cir. 2012). "The elements necessary to recover damages for negligence are: (1) the existence of a duty on the part of the defendant to protect the plaintiff from the injury complained of, and (2) an injury to the plaintiff from the defendant's failure." *Black's Law Dictionary* 1196 (10th ed. 2014).

Plaintiffs argue that Crosby was negligent for not pumping the RICKY B and for towing it at an excessive speed. As discussed *supra* at Part III.B.1., Crosby had no duty to pump the RICKY B before towing it. Thus, it could not have been negligent for failing to pump the vessel. As to the argument that Crosby towed the RICKY B at an excessive speed, the Court finds that plaintiffs failed to establish by a preponderance of the evidence that speed contributed to the sinking of the RICKY B. As stated *supra* at Part III.B.1., the Court credits Captain Trosclair's testimony that he towed the vessel at a maximum speed of five knots. Neither of plaintiffs'

34

expert witnesses testified that this was an unsafe speed.[82] Further, Arthur Sargent, Crosby's expert in the field of naval architecture, testified that the speed of towing did not cause the RICKY B to sink, since the vessel was capable of traveling significantly faster than five knots without taking on water when properly secured. The Court concludes that Crosby was not negligent.

**IV.    CONCLUSION**

For the foregoing reasons, the Court finds that Crosby is not liable to plaintiffs for the expenses they incurred in salvaging the M/V RICKY B from the Gulf of Mexico. Accordingly, the Court renders judgment in favor of Crosby.

New Orleans, Louisiana, this 21st day of July, 2014.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[82] *See* Testimony of Timothy Anselmi (stating that "bare steerage," *i.e.* 2.5 knots, would have been the "safest speed" at which to tow the RICKY B, but acknowledging that four knots was a safe speed and testifying that ten knots would be "way too fast"); John Leary (stating that he has no opinion as to what would have been a safe towing speed).